**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY BILINSKY, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 16 C 4253 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Bilinsky sued American Airlines, Inc. ("American") alleging violations of her rights under the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12203 ("ADA"), by denying her a reasonable accommodation (Count I) and retaliation for requesting a reasonable accommodation (Count II). Bilinsky also alleges the same conduct violated the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq.* ("IHRA") (Count III). American moves for summary judgment as a matter of law on all three counts. *See* (Dkt. No. 59). For the following reasons the Court grants American's Motion. [59.]

## BACKGROUND

The following facts from the parties' Local Rule 56.1 Statements are undisputed unless otherwise noted.[1] Bilinsky is a former American employee who suffers from multiple sclerosis ("MS"). *See* (Dkt. No. 61, at ¶¶ 1, 8) (Def.'s SOF). Her MS causes weakness on the right side of her body impacting her gait, strength, and balance, which can be exacerbated by heat and stress. *Id.* ¶ 9. She also is unable able to run or do other physical activities that require balance but can use a computer. *Id.* ¶ 13.

---

[1] American challenges many of Bilinsky's responses to its Statement of Facts as improper. *See* (Dkt. No. 76, at 13). Those challenges have been carefully reviewed and the facts take those challenges into account.

1

### 1. Pre-Merger Employment

Bilinsky started working for American in 1991 where she held various positions, eventually becoming a Senior Specialist, Flight Service Communications ("Communications Specialist") in the Flight Service Department in 2007. *Id.* ¶ 3. The position reported to American's headquarters in Fort Worth, Texas, located near Dallas/Fort Worth International Airport ("DFW"). *Id.* ¶¶ 2, 20. Around the time of her interview for the position, Bilinsky informed hiring manager Laura Tolar ("Tolar") that she would be unable to move to Texas because heat aggravated her medical condition. *Id.* ¶ 21. Consequently, Tolar and Bilinsky reached what they called a "work-from-home arrangement" ("WFHA") where Bilinsky could work primarily from her home in Lake Barrington, Illinois, while traveling to DFW approximately one day per week and with occasional travel to locations other than DFW as well. *Id.* ¶¶ 6, 24. Although there was no written job description for her position, Bilinsky's responsibilities included: researching, writing, editing and publishing numerous articles and communications for the Flight Services Department; managing a Flight Service website and database; providing weekly service updates; attending daily conference calls; and attending a weekly staff meeting in Dallas, Texas. *See* (Dkt. No. 67, at ¶¶ 7-8) (Pl.'s SOAF).

### 2. Post-Merger Employment

In December 2013, American merged with US Airways. *See* (Dkt. No. 61, at ¶ 28). The merger required American to combine its operational processes with US Airways so as to obtain a "single operating certificate," while also instigating an integration process to merge procedures, operations, collaboration tools, and media channels. *Id.* ¶ 29; *see also* (Dkt. No. 62-2, Ex. 7, at 24:9-25:8) (Carlson Dep.). Hector Adler ("Adler"), then Vice

President of the Flight Service Department, testified this undertaking was a complicated endeavor requiring coordination between multiple departments. *See* (Dkt. No. 61, at ¶ 30); (Dkt. No. 62-2, Ex. 6, at 23:3-17) (Adler Dep.). Specifically, Adler noted:

> "The flight services department had responsibility to combine the policies and procedures for flight attendants between two legacy carriers into a single operating manual and at the same time work in cooperation with the other operating departments to ensure that we were coordinated at every point. We had to develop the procedures, write the manuals, and communicate changing information to the employees. It was a very extensive and significant task that involved nearly every person in the department."

*Id*. He further described the post-merger environment as one in which the communications team "needed to able to communicate on short notice" and need to "respond to the myriad of problems and deadlines that were coming up every day often without prior notice." *Id*. 36:5-10. With all the tasks requiring participation in meetings and strategy, Adler added, there were not enough people to go around and he felt it "special that all of [the team] be in one place." *Id*. 11-22. Early in 2014, based on the changing environment, Adler transitioned Bilinsky's communications team to one "with a higher degree of in-person engagement" and required all Flight Service Department employees with DFW-based positions work from DFW including those who previously worked from home on a regular basis. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17).[2,3] During this

---

[2] Bilinsky notes that as of July 2017, certain employees from the Department were based in Phoenix, Arizona. *See* (Dkt. No. 67, at ¶ 37). However, this factual dispute is irrelevant for two reasons: first, according to Adler, the Phoenix employees must work from Phoenix because they perform administrative functions for which the operating systems are not integrated into American's system at DFW. *See* (Dkt. No. 67-6, Ex. E, at 14:13-15:18); and second, American claims the Department employees in Phoenix did not have "headquarters positions" in the first place, and thus were not subject to the same requirements as Bilinsky. *See* (Dkt. No. 76, at 16).

[3] Bilinsky disputes these observations; reiterating that Adler did not personally work with Bilinsky and neither he nor Rhonda Nicol-Perin ("Nicol-Perin") of Human Resources had adequate understanding of Bilinsky's everyday responsibilities. *See, e.g.,* (Dkt. No. 67, Pl. Resp. at ¶¶ 34-41). Regardless of the merit of these points, they are not responsive to American's observations of the general environment at headquarters and the reason Defendant transitioned the Department.

same time only two other Flight Services Department employees worked on some form of WFHA and when American changed its policy after the merger one of them relocated. *See* (Dkt. No. 61, at ¶ 42). The other employee refused to relocate from California and was therefore subject to the same reduction-in-force. *Id*.

Fearful that these changes would impact her WFHA and that the Dallas climate would limit her functions, Bilinsky met with her immediate supervisor Cathy Scheu ("Scheu") on May 20, 2014. *See* (Dkt. No. 67, at ¶ 10). Bilinsky informed Scheu that her current WFHA was a necessary accommodation for her to keep doing her job because of her disability. *Id*. at ¶ 11.[4] After internal consultations between Adler, Scheu, Human Resources employee Rhonda Nicol-Perin ("Nicol-Perin"), and American's Area Medical Director Dr. Jeral Ahtone ("Ahtone"), Adler ultimately decided to deny Bilinsky's request to continue with her current WFHA. *See* (Dkt. No. 61, at ¶¶ 50, 60); (Dkt. No. 62-2, Ex. 2, 29:1-10) (Nicol-Perin Dep.); (Dkt. No. 67, at ¶ 13). Adler based denial of Bilinsky's request in part on his decision to have his entire communications team physically housed at DFW. *See* (Dkt. No. 67, ¶ 15).

### 3. Accommodation Denial and Termination

Scheu and Nicol-Perin informed Bilinsky that her request to continue the WFHA had been denied and asked her what other accommodations American could make at DFW that would permit Bilinsky to work there. *See* (Dkt. No. 61, at ¶¶ 60, 61). But Bilinsky made clear that "unless the company could provide a tube of air conditioning around her body 24 hours a day," there was no possible accommodation available. *Id*. ¶ 61. According

---

[4] It is unclear whether Bilinsky specifically requested an accommodation during this meeting, but this is immaterial based on subsequent events indicating that she requested an accommodation that was received and processed by American. *See* (Dkt. No. 61, at ¶¶ 47-50, 76).

Bilinsky it was not the conditions at headquarters specifically; rather it was the location of headquarters *in Texas* that made it impossible for her to relocated. *Id.* ¶¶ 61, 62. Unable to agree on an accommodation for a position at DFW, American allowed Bilinsky to apply for other available positions while Scheu and Nicol-Perin checked to see if there were open positions in Chicago. *Id.* ¶ 64.

American informed Bilinsky that her last day as a Communications Specialist would be March 27, 2015, and that she would be placed on administrative leave until April 30 to allow her time to apply for other positions including a position as Specialist Corporate Sales based in Chicago. *Id.* ¶¶ 65, 66. Both Scheu and Nicol-Perin assisted Bilinsky with the search process and in trying to obtain a different, amicable position with American. *Id.* ¶¶ 67, 68, 69. For example, around March 25, 2015, Scheu contacted Bilinsky about a vacant Specialist Corporate Sales position based in Chicago. *Id.* ¶¶ 65, 67, 68. Scheu and Nicol-Perin reached out to colleagues on Bilinsky's behalf, but she was not selected because she lacked the requisite experience. *Id.* ¶¶ 67, 68, 73. Nicol-Perin looked for other positions in the Flight Services Department in Chicago as well, but there were none. *Id.* ¶ 69. There were other support staff positions open in Chicago at the time, but Bilinsky told Nicol-Perin she was uninterested in any of them. *Id.*

Around the same time Belinsky asked to continue with her WFHA, she also applied for an Analyst, Manuals, and Documentation position based out of DFW. *Id.* ¶¶ 76, 77. The employee who previously held that position prior to the merger worked from home and refused to relocate to DFW and so was subject to reduction-in-force. *Id.* ¶ 78. American ultimately hired someone else for the Analyst, Manuals, and Documentation position in part because it required work at DFW "and not from a remote location,"

although Belinsky believes she was denied the position for the same reasons she was unable to continue her WFHA in her former position. *Id.* ¶¶ 78, 79, 80.

Bilinsky's last day at American was May 1, 2015. *Id.* ¶ 4. She filed her Charge of Discrimination of the Equal Employment Opportunity Commission May 4, 2015 and received her Right to Sue letter on March 8, 2016. *See* (Dkt. No. 1, at ¶ 4; Ex. A). She filed the current Complaint roughly one month later. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). A genuine dispute of material fact exists if, based on the evidence, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must set forth facts that show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255. Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## DISCUSSION

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). An employer's failure to make a reasonable accommodation for any employee with a known disability constitutes prohibited discrimination under the ADA. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008). The same section further defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability … or … denying employment opportunities to a job application or employee who is an otherwise qualified individual with a disability, if such a denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(A)-(B).

The ADA also "prohibits employers from retaliating against employees who assert their rights under the act to be free from discrimination." 42 U.S.C. § 12203(a); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). This includes retaliation even where the initial claim of discrimination is found to be meritless. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

American seeks summary judgment on Belinsky's ADA claims alleging American failed to accommodate her and for retaliation for not selecting her for the Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 60, at 3, 5-6). American's position is that Bilinsky fails to meet her initial burden of proving she was a qualified individual or – even

if she has – that they engaged in an interactive process for a reasonable accommodation. *Id*. at 5-6. As for the retaliation claims, American argues Bilinsky fails to establish a causal connection between her request for an accommodation and American's decision not to hire her for the Corporate Sales position. *Id*. at 3. They further seek judgment as a matter of law on the identical claims filed pursuant to the IHRA. *Id*. at 18-19.

## A. Failure to Accommodate

The ADA permits two categorical claims for discrimination: disparate treatment and failure to accommodate. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015); *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001). Count I does not allege facts consistent with a disparate treatment claim. *See generally* (Dkt. No. 1) (failing to allege discrimination pursuant to 42 U.S.C. § 12112(a)). More so, Bilinsky concedes that she "filed an action under the ADA based on her employer's failure to provide her with a reasonable accommodation," *see* (Dkt. No. 71, at 11), and does not challenge American's assertion that Count I solely raises a failure to accommodate claim and not one for disparate treatment. *See* (Dkt. No. 60, at 5); *see generally* (Dkt. No. 71). Bilinsky alleges that American violated the ADA when it denied her request to continue working pursuant to her existing WFHA and did not offer her any alternative accommodation. For its part American argues that Bilinsky was not a qualified individual because she was unable to perform the essential functions of her job after the merger. *See* (Dkt. No. 60, at 6-11).

To succeed on a claim for failure to accommodate, a plaintiff must show that she is a "qualified individual" with a disability and that her employer is aware of her disability.

*See Basith*, 241 F.3d at 927; *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013). The term "qualified individual" is defined as:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desire. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that she is a qualified individual who could perform the essential functions of her position. *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). Additionally, a failure to accommodate claim fails if the plaintiff cannot first establish that she is a "qualified individual" with a disability. *Basith*, 241 F.3d at 932 ("[w]e need not decide whether Basith was denied reasonable accommodation in light of his failure to show a question of fact existed as to whether he was a qualified individual with a disability") (internal quotations omitted); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (explaining that a failure to accommodate under the ADA requires a *prima facie* showing that the plaintiff is or was a qualified individual with a disability).

In the current litigation American challenges only Bilinsky's status as a qualified individual; they do not dispute that Bilinsky is a person who is disabled or that they were aware of her disability. *See* (Dt. No. 60, at 5-6). To determine whether an individual is "qualified" the Court must look to "whether the individual satisfies the prerequisites for the position and then turn[s] to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018). American doesn't dispute

Bilinsky's qualifications, *see* (Dkt. No. 60, at 6 n.4), so the Court focuses solely on her ability to perform the essential functions of the position. Whether a function is essential is a question of fact. *See Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) ("[t]he essential-function inquiry is a factual question, *not* a question of law") (emphasis in original). Essential functions are determined by looking at factors including but not limited to the employer's judgment as to which functions are essential, the consequences of not requiring the employees to perform the function, and past and current work experiences. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2014); *see also* 29 C.F.R. § 1630.2(n)(3). The presumption is that the employer's judgment as to what is essential is correct unless the plaintiff offers sufficient evidence to the contrary. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010); *Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011); *Coleman v. Caterpillar, Inc.*, 2017 WL 3840423, at *6 (C.D. Ill. Sept. 1, 2017) (presumption in favor of employer where plaintiff did not offer evidence to the contrary that employer's understanding that at least occasional physical presence at work was essential to the job of advanced purchasing analyst). But while the employer's judgment is one factor to consider it is not controlling and the Court looks at the employer's actual practices in the workplace as well. *See DePaoli v. Abbott Labs.*, 140 F.3d. 668, 674 (7th Cir. 1998) ("[a]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions … we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job"); *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011); *Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015).

A "reasonable accommodation" may include things such as making work facilities accessible to individuals with disabilities, or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. *See* 42 U.S.C. § 12111(9)(A)-(B).

Turning first to the employer's judgment, it is undisputed that American decided an everyday presence was an essential function of the Communications Specialist position after the merger with US Airways. (In American's view, after the merger the level of intra- and inter-departmental coordination made daily availability at DFW vital for all communications employees. *See* (Dkt. No. 60, at 7). Hector Adler, American's Vice-President of the Flight Service Department described the merger process as a "very extensive and significant task that involved nearly every person in the [D]epartment." *See* (Dkt. No. 67-6, Ex. E, at 23:8-17); *see also* (Dkt. No. 61, at ¶ 30). After several months of observing Department operations, Adler concluded that the Department was not adequately responding to the unpredictable issues arising on a day-to-day basis. *See* (Dkt. No. 67-6, Ex. E, at 27:20-28:13). As the person responsible for setting the operational direction of the Department, and with the desire to create a productive response team, Adler decided to transition the Department from what he called an "e-mail shop" to a team with a "different level of engagement and involvement from all the team members." *See* (Dkt. No. 67-6, Ex. E, at 21:11-24); *see also* (Dkt. No. 61, at ¶¶ 32-33). Consequently, he set in place the requirement that all Department employees be physically present at DFW five day per week. *See* (Dkt. No. 67-6, Ex. E, at 58:13-19); *see also* (Dkt. No. 61, at ¶ 37). American

asserts that because Bilinsky refused to relocate to Texas, she could not perform this essential function of the positions as newly defined and therefore is not a qualified individual.

American's shift in essential function is corroborated by testimony consistent with the fact that the change was complex and hectic in the post-merger environment and exhibits the problems associated with not having all Department employees available at DFW headquarters. For example, Adler noted the importance of "the ability to interact quickly as situations arose" and stated that "it would have been unfair to other members of the team to constantly be pulled onto assignments simply because they were present and others were not." *See* (Dkt. No. 67-6, Ex. E, at 42:1-13). Bilinsky's former manager, Linda Carlson, expressed the importance of having [communications] teams centrally located after the merger. *See* (Dkt. No. 75, at 3); (Dkt. No. 67-8, Ex. G, at 26:19-22). Another former manager, Cathy Scheu, testified that "as we moved through [the merger process] ... we really did need for people to be at headquarters, particularly the communications group." *See* (Dkt. No. 67-7, Ex. F, at 46:11-22).

Bilinsky does not dispute her inability to be physically present at DFW five days per week. Rather, she asserts that the record shows a genuine dispute of fact as to whether her daily attendance was an essential function. *See* (Dkt. No. 71, at 7). Further, she reminds the Court not to "simply defer" to the employer's judgment about what constitutes an essential function. *Id.* She also points to her history of performing the job remotely and includes testimony from her supervisors stating that even after the merger she performed duties normally assigned to others and was willing to "pick up the slack." *See* (Dkt. No. 67, at ¶ 19); (Dkt. No. 67-8, Ex. G, at 27:7-13). But these facts do not sufficiently outweigh

American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute.

First, Bilinsky ignores a key fact: that her job duties changed after the merger; requiring a physical presence in Dallas. American does not dispute that Bilinsky satisfactorily performed her job duties from home prior to the merger, but multiple American employees uniformly agree that is was in America's best interest to require the communications staff have a daily physical presence at DFW headquarters after merging with US Airways. When an employee is facing a "policy change that came from above" and the policy change requires the presence of an employee in a specific location, that becomes an essential job function. *See e.g. Gratzl*, 601 F.3d at 680 ("[Plaintiff] cannot prove that she is qualified for her current job simply by citing that show was qualified for a previous job, with different essential functions, that has been eliminated.") In *Gratzl*, for example, the plaintiff had served as a court reporter who worked exclusively in a control room of the courthouse. This was ideal for plaintiff who suffered from incontinence and could take frequent bathroom breaks. But the State eliminated her job of court reporting specialist and required all court reporters to rotate throughout all the courtrooms in the courthouse. Plaintiff refused to rotate, and the courthouse employer worked to see if other accommodations would work such as placing her in juvenile courtrooms, but all proposals were rejected by plaintiff and as such she was given notice of termination. In finding that the district court correctly granted summary judgment for the employer, the Court found that plaintiff's refusal to "consider any accommodation that required that she do in court reporting strongly suggested that she believed she was incapable of performing this function. Therefore, she is not qualified for the job." *Id.*

Similarly, the undisputed facts, such as testimony from Adler, Scheu, Carlson and Nicol-Perin, shows that American had a legitimate reason for altering the job requirements and the actions they took substantiate the need to do so. *See e.g., Walter v. Wal-Mart Stores Inc.*, 2011 WL 4537931, at *11 (N.D. Ind. Sept. 28, 2011) (citing *Gratzl*, 601 F.3d at 680) ("[a]n employee's job description is permitted to evolve, and an employer is not required to maintain an existing position or structure that, for legitimate reasons, [the employer] no longer believes is appropriate") (internal quotation marks omitted). With two major airlines merging, American's decision to mandate its communications team to work out of DFW is similarly appropriate. Similar to the plaintiff in *Gratzl*, Bilinsky can perform the communications job that she had, but her refusal to perform the functions of that job five days a week in person in the Texas headquarters where her employer has now deemed it essential for purposes of employing a responsive communications team that is not merely emailing responses, demonstrates that she is not qualified for the position. As the Court noted in *Gratzl*:

> Another way to look at the question is whether the only accommodation that Gratzl requested—exclusive assignment to the control room—was a reasonable accommodation. Because Gratzl bears the burden of establishing that she can perform the essential functions of her job with or without reasonable accommodation," (cite omitted) she has not met this burden if the only accommodation she has ever suggested is not reasonable.

*Id.*

Second, the fact that Bilinsky's supervisor found her work ethic and work-product post-merger satisfactory is irrelevant to whether a physical presence at DFW became an essential work function according to American. *See Taylor-Novotny*, 772 F.3d at 493 (the plaintiff bears the burden of proving she is a qualified individual by showing an ability to perform *all* essential functions). The relevant issue is not about how well Bilinsky could

14

do the work; rather it is about the work she could not do at all. *See Gratzl* at 680. For example, while commending Bilinsky's willingness to "pick up the slack" on a project, Carlson (her supervisor) noted that by working from home, "[Bilinsky] just wasn't able to do things that you needed to do to support an event," such as driving to an event, checking out equipment, or directly meeting with flight service subject matter experts. *See* (Dkt. No. 67-6, Ex. G, at 27:7-18). As mentioned above, the evidence suggests that Bilinsky's absence put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally. *Id.*, Ex. E, at 41:21-42:13; *see also Coleman*, 2017 WL 3840423, at *6 (although the plaintiff's performance was not officially deemed unsatisfactory while working remotely, she still failed to carry her burden of proof establishing that physical presence at work was not an essential function because her absence placed a greater burden on co-workers).

Additionally, it's worth noting that the other two communications employees who previously worked from home were not permitted to continue under their similar WFHA situations. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17). American also states that, currently, no Department employees with "headquarters positions" work from home. *See* (Dkt. No. 61, at ¶¶ 43-44); (Dkt. No. 60, at 7). As such, American offers substantial evidence supporting its determination that a physical presence at DFW was an essential function of the Communications Specialist positions after the merger while Bilinsky offers insufficient evidence to create a dispute of material fact. Deference to American's judgment as the employer is required in the absence of an adequate factual or legal basis to abandon that deference. *See Gratzl*, 601 F.3d at 679; *DePaoli*, 140 F.3d at 674.

Bilinsky relies on *Shell v. Smith*, *Miller v. Illinois Department of Transportation*, and *Bixby v. Morgan Chase Bank*; all three are readily distinguishable.

In *Shell v. Smith*, before remanding for a factual dispute, the court held that a change in management did not impact whether a task was an essential function of a job; rather the inquiry should focus on actual employment practices and the plaintiff's prior performance.[5] 789 F.3d at 718-19. In contrast to the plaintiff in *Shell*, the fundamental aspects of Bilinsky's job changed because the Flight Services Department served a considerable communications role during the merger. Where in *Shell* the job description remained the same after the change in management, the actual duties required of Bilinsky by American changed because of the merger with US Airways.

She also relies on *Miller v. Ill. Dep't of Transp.*, a case where an employee with a fear of heights was denied an accommodation that he not work "on bridge beams and other extreme places" over a certain height after suffering a panic attack on an overpass construction job. *See Miller*, 643 F.3d at 192-94. In reversing summary judgment for the employer, the court held that the locations where Miller worked were not actually an essential function of his job; rather they were easily modifiable assignments and so he could not request an accommodation based on them. *Id*. at 200. In contrast, Bilinsky's Department duties changed after the merger and those changes directly impacted the employment location. The plaintiff in *Miller* effectively asked his employer to formalize for him what the Court said was already occurring in the normal course of business – to

---

[5] The employee, who suffered from hearing and vision impairment, was a mechanic's helper and the job description said the position may occasionally involve driving buses. But to drive the buses an employee needed to have a commercial driver's license ("CDL"). Based on the vision and hearing impairments the employee could not obtain a CDL. This was not an issue until the employer came under new management, which terminated the plaintiff for failure to obtain a CDL. *See Shell v. Smith*, 789 F.3d at 716, 721.

reassign him to tasks or jobs that did not involve danger of heights. *Id*. To the contrary, the merger in this matter altered what was the normal course of business for American and its employees and so *Miller* is inapplicable.

Next Bilinsky relies on *Bixby v. JP Morgan Chase Bank, N.A.* – a case where the district court held that allowing a plaintiff to work from home for a period constitutes a reasonable accommodation because the employer allowed other similarly situated employees to work from home as well. *See* 2012 WL 832889, at *11 (N.D. Ill. Mar. 8, 2012). First, this Court is not bound by decisions of other district court judges. Second, the facts as to the reasonableness of the work-from-home arrangement in *Bixby* suggest that such an accommodation was reasonable and would not impact job performance. *Id*. at *9-11. In contrast, the evidence here shows that the merger resulted in a change in job responsibilities that could not be readily performed from home. *See* (Dkt. No. 67-7, Ex. F. at 48:5-13). This is supported by the actions of American who did not permit two other employees with WFHAs to continue doing so after the merger. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17).

Bilinsky also argues that American did not adequately engage in the interactive process to provide a reasonable accommodation. *See* (Dkt. No. 71, at 15). However, because she failed to sustain her burden of proving that she was a qualified individual the question of whether American offered her a reasonable accommodation is moot. *See Basith*, 241 F.3d at 932; *see also Stern*, 788 F.3d at 292 ("the employee must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job"). There is no factual dispute about whether Bilinsky was a qualified individual after the Communications Specialist position changed due to the merger; she

was not.  The change in the position requirements after the merger altered the essential functions to include a physical presence at DFW and Bilinsky refused to relocate.  Even if Bilinsky were entitled to a reasonable accommodation there is no dispute that American made every effort to place Bilinsky in other employment positions, worked with her to find another position, and considered her for other positions.  As such, American's motion for summary judgment as to the ADA claim for failure to accommodate (Count I) is granted.

## B. Retaliation

An employer is equally prohibited from retaliating against any individual who asserts a right pursuant to the ADA.  *See* 42 U.S.C. § 12203(a).  An aggrieved employee can show retaliation through either direct or indirect methods of proof.  *See Dickerson*, 657 F.3d at 601.  Bilinsky does not allege or argue facts consistent with the indirect method by, for example, trying to show that similarly situated employees received more favorable treatment.  *See Mobley*, 531 F.3d at 548 (enunciating the elements for an indirect method of proof for ADA discrimination including comparison of treatment to similarly situated persons).  Under the direct method of proof Bilinsky must demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two.  *Rodrigo*, 879 F.3d at 243.

"To show causation under the direct method, an employee must show that her protected activity was a substantial or motivating factor behind the adverse employment action."  *Taylor-Novotny*, 772 F.3d at 495 (internal citation and quotations omitted).  One way to establish causation is by showing a direct admission of retaliatory motive.  *Id*. Another way is to present a "convincing mosaic" of circumstantial evidence supporting an inference of retaliatory animus.  *Id*.  Categories of circumstantial evidence include: (1)

"suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn[;]" (2) "evidence … that similarly situated employees were treated differently[;]" and (3) "evidence that the employer offered a pretextual reason or the adverse employment action." *Id*.

To begin, the record is clear that Bilinsky did not have the requisite qualifications for the Corporate Sales position in Chicago, Illinois. *See* (Dkt. No.61, at ¶¶ 67-68, 73). Based on these undisputed facts, American cannot be said to have retaliated against Bilinsky by not selecting her for the position in Chicago; instead they simply did not hire her because she lacked the experience.

As for the Analyst Manuals position in Texas, Bilinsky does not set forth any evidence of suspicious timing, ambiguous statements, or a discrepancy between similarly situated employees. [6] She argues only that American lacked a legitimate, non-discriminatory basis for denying her the Analyst Manuals position because (1) it was previously held by someone with a similar work-from-home arrangement; (2) her interviewer and would-be supervisor was aware of her current WFHA and still indicated that Bilinsky was her "top choice" for the position; (3) her current supervisor, Adler, knew that she applied for the position; and (4) no evidence suggests that American considered the job duties in determining Bilinsky was unqualified because the position required a physical presence at DFW as an essential function. *See* (Dkt. No. 67, at ¶¶ 26-29); (Dkt. No. 71, at 19). Even if Bilinsky had argued suspicious timing the argument fails because of the length of time between her request for accommodation and the date they informed her of the hiring decision for the Analyst Manuals position. *See* (Dkt. No. 67, at ¶ 26);

---

[6] Although Bilinsky references employees who have WFHA agreements as of 2017, they are not comparable because they do not hold "headquarters positions" and so they are not similarly situated.

(Dkt. No. 60, at 17); *Mobley*, 531 F.3d at 549 (suspicious timing is generally limited to days, or at most, weeks of the employee's exercising a protected right). Furthermore, the record is devoid of ambiguous statements or examples of similarly situated employees receiving preferential treatment in hiring after requesting an accommodation.

The parties do not dispute that Bilinsky's request for an accommodation constitutes a protected activity or that American's decision to deny her the position constitutes an adverse action. But even assuming these elements are satisfied, Bilinsky cannot establish a causal connection between her request for an accommodation and American's decision not to offer her the Analyst Manuals position. She offers no direct evidence relating the actions and does not cite any circumstantial evidence which permits a reasonable inference that American retaliated against her. There is no evidence that Laura Risley – the woman who interviewed her and would have been her supervisor – was aware that Bilinsky had a pending request for accommodation with American. Further, although Adler knew of her request for accommodation, Bilinsky states Adler "had no vendetta" against her. *See* (Dkt. No. 61, at ¶ 80). In fact, she admits her belief for not getting the position was because "Adler decided that all individuals in his department needed to be physically present at headquarters." *See* (Dkt. No. 67, at ¶ 79). Bilinsky further states it was her opinion that she was denied the position for "the same reason that American didn't allow her to stay" in her Communications Specialist job. *See* (Dkt. No. 61, at ¶ 80). These assertions essentially undercut her claim of retaliation because Adler's decision that all Department employees had to be present at headquarters is precisely a "legitimate, non-discriminatory basis" for denying her the position.

In response to other facts noted by Bilinsky, American also points out that the Analyst Manuals position was open in the first place because the previous employee refused to alter her work-from-home arrangement and was subject to reduction-in-force. *See* (Dkt. No. 61, at ¶ 42). Additionally, even if Bilinsky was Risley's first choice for the position that fact bears little significance in the context of the entire record. Bilinsky even acknowledges that Risley could not unilaterally approve her hiring and that American's motive was operational in nature.

There is no disputed fact requiring a jury to determine whether American retaliated against Bilinsky by not hiring her for positions that either she was not personally qualified for or that required a physical presence at American's DFW headquarters. Therefore, American's motion for summary judgment is granted as to the claim for retaliation (Count II).

## C. IHRA Claim

Given that the American is entitled to summary judgment on the ADA claims (Counts I and II), the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claim alleging a violation of the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq.* Of course, where a district court has original jurisdiction over some claims, such as the ADA claims alleged by Bilinsky, it has supplemental jurisdiction over other claims that are so related that they form a part of the same case or controversy. *See Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). But if the district court dismisses all claims over which it has original jurisdiction, the court's supplemental jurisdiction persists with the caveat that the court can elect to decline to exercise supplemental jurisdiction at its discretion. *Id*. at 738. "[I]t is the well-established law of this circuit that

the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Yet there are three exceptions to this general rule, which are: (1) where any applicable statute of limitations has run, precluding the filing of a state court claim; (2) where the court has already committed substantial resources; and (3) when resolution on the pendant claim is "absolutely" clear. *See Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Based on the decision above regarding the ADA claims and the applicable law in Illinois related to IHRA claims, the third exception applies and so the Court addresses Bilinsky's IHRA claim below.

"The IHRA provides a comprehensive scheme of procedures and remedies for redressing human rights violations." *Rabe v. United Air Lines, Inc.*, 971 F.Supp.2d 807, 819 (N.D. Ill. 2013) (Pallmeyer, J.) (citing 775 ILCS 5 § 1-101, *et seq.*). Bilinsky alleges violations of the IHRA against American for denying her request to continue her WFHA as a Communications Specialist, and for taking "adverse actions" in denying her Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 1, ¶¶ 27-29). Both Parties agree that the Illinois Supreme Court has adopted the same standard, or analytical framework, employed in federal employment discrimination cases for IHRA claims. *See Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (1989); *see also Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016); *Compare* (Dkt. No. 60, at 18), *with* (Dkt. No. 71, at 20). Application of this standard leads to the same result. Where the Court holds there is no genuine dispute of a material fact and judgment as a matter of law proper for the ADA claims (Counts I and II), so too is the case for Bilinsky's IHRA claim. No reasonable jury could return a verdict in favor of Bilinsky based on the

undisputed facts before the Court and so American's Motion for Summary Judgment on the IHRA claim is also granted.

## **CONCLUSION**

American's Motion for Summary Judgment as a matter of law is granted as to all three counts.

Hon, Virginia M. Kendall
United States District Judge

Date: August 31, 2018